Tannie AKERS, Appellant,

v.

UNITED CARBON GAS COMPANY, etc.,
et al., Appellees.

Court of Appeals of Kentucky.

Feb. 12, 1965.

————◆————

Combs & May, Pikeville, for appellant.

E. R. Hays, Pikeville, for appellee.

DAVIS, Commissioner.

The appellant seeks to reverse the judgment of the circuit court which affirmed a ruling of the Workmen's Compensation Board denying her claim for death benefits arising incident to the death of her husband. KRS, Ch. 342.

The sole question, as posed by the appellant, is whether the decision of the Board was supported by evidence of probative value.

The decedent, Birl Akers, had been an employee of United Carbon Gas Company for many years. His work was described as "field work" which included running tubing, pulling casing, digging ditches, loading and unloading pipe, and cleaning rights-of-way for pipelines.

Shortly after 7:00 a. m. July 27, 1962, Akers reported for work at the company's warehouse near Pikeville. In company with two fellow employees he rode to Millard, where the three men erected a platform. After that task was accomplished the three workmen proceeded to Marrowbone Creek for the purpose of cleaning out around a gas well preparatory to painting.

In order to reach the site of their work, the three men were required to walk up a hill for several hundred feet. Akers was carrying a gallon can of paint and a paint brush as he walked up the hill. The three men paused "to catch their breath" after having traversed about five hundred feet up the grade, which was described as not severely steep.

After another short walk, Akers again stopped "to catch his breath." The other two men went ahead; they had nearly completed cleaning out around the well when they heard Akers calling them. Responding to his call, they found him at a point farther up the hill than where they had left him. He was ill and pale. There was evidence that he had suffered nausea and had vomited. Akers was seated on the ground just at a gate. · Some significance is attributed to the gate, because one of the two doctors who treated Akers testified that the latter had told him that he had "lifted a gate" just before his seizure of illness. The fellow workmen of Akers expressed doubt that Akers had lifted the gate, since the gate was partially broken down, and they had passed through it without the necessity of lifting or opening it.

After resting a short while, Akers walked down the hill, assisted somewhat by one of his fellow workmen. He was taken to his home, and from there he went to the office of Dr. O. W. Thompson, Jr.

Dr. Thompson examined him in the office, and found Akers to be "cool, pale and sweaty"; the doctor noted that the lungs of the patient appeared ·clear, with "occasional skip beat on oscillation." At that time Akers' blood pressure was 110/80;

he appeared anemic, and his hemoglobin count was 11 grams.

Later that day Akers was admitted to the hospital where Dr. Thompson re-examined him. The doctor reported the findings of the second examination as follows: "As far as physically it was the same, blood pressure was 110/40 and of course he had findings of heart murmur and hemoglobin had dropped to 9.25." Akers then could "talk some," according to Dr. Thompson's account. Dr. Thompson felt that Akers was suffering gastro-intestinal hemorrhage.

Dr. Thompson prescribed a blood transfusion, as he feared Akers would bleed to death. The blood, however, caused congestive heart failure, from which Akers died on July 29th.

Dr. Thompson completed the death certificate whereon he ascribed the cause of Akers' death to "(a) rheumatic heart disease and congestive failure due to (b) gastro-intestinal hemorrhage." When questioned as to whether the activities of Akers had been sufficient (on July 27th) to cause internal bleeding, Dr. Thompson answered, in part, " * * * I would just have to say it is possible." He added: "How much exertion it takes to make a man bleed I don't know, I think any amount if he is about ready to bleed, the same way he can cough and rupture an ulcer, which I have seen happen."

There was no specific finding of an ulcer affecting the decedent. No autopsy was performed. Dr. Thompson, as well as Dr. Clark (who was called in for consultation) expressed their belief that an ulcer was the most likely source of the internal hemorrhage; however, each of them conceded that neither could say with certainty where the source of the bleeding had been, nor could they tell what caused it.

The two doctors were at variance as to whether an electrocardiogram reflected recent myocardial infarction. According to Dr. Thompson the EKG showed "first degree heart block, left ventricle enlargement, but no evidence of recent infarction." On the other hand, Dr. Clark said the EKG "showed myocardial infarction that was acute, and also showed some old changes that were indicative of right ventricular enlargement."

The general past medical history of decedent reflected that he had a known heart disease, although he had been able to continue working with no apparent difficulty from that source. Each of the doctors expressed the view that the heart condition would not have caused Akers' death absent the hemorrhage.

▅▅▅ The Compensation Board found that the proof failed to establish that the death of Birl Akers "resulted from any exertional factor" relating to his employment. So, the question as posed by appellant is not accurate; the question is not whether the Board's finding is *supported* by substantial evidence, but whether the quantum of claimant's proof is so clear-cut and convincing as to preclude the Board's finding against the claimant. We think it is apparent that the Board quite properly declined to be persuaded by the claimant's proof. This it was authorized to do. Lee v. International Harvester Co., Ky., 373 S.W.2d 418; Columbus Mining Co. v. Childers, Ky., 265 S.W.2d 443, 445.

The judgment is affirmed.